May it please the Court, good morning. I am Julie McCoy and I represent the appellant Focus Media. We ask this Court to reverse the order for relief and to remand this case to the Bankruptcy Court with directions to enter an order dismissing the petition. Here are the reasons why. By all accounts, involuntary bankruptcy is a harsh remedy capable of ending the life of a business. Aware of that, the Congress mandated certain safeguards for alleged debtors, safeguards to prevent the weapon of involuntary bankruptcy from being used to force the payment of disputed debts or to drive an otherwise unprofitable debt into the hands of a bankruptcy company. The Congress mandated that the Bankruptcy Court be able to afford it those protections of the Bankruptcy Code. We would not be here today. But Focus Media was denied the most basic of those protections, the requirement that the claims on which an involuntary bankruptcy is subject to be a dispute as to the entirety of the claims that were  Kennedy. I thought what the counsel or your predecessor seemed to suggest. McCoy. Your Honor, what I would suggest to this Court is that there were significant disputes going not only to the amount that was owed, but to the viability of the underlying claims. I thought these were post, you know, post-advertisement adjustments. And counsel seemed to counsel for Focus Media seemed to say, well, we owe these, but it's just a question at most of adjustments. Actually, Your Honor. The law seems pretty clear that that doesn't create a bona fide dispute. Actually, Your Honor, the nature and the magnitude of the disputes that were raised by my client in opposition to the motion for summary judgment actually show that the entire claims were in dispute. And I think, in fact, this was conceded by the petitioning creditors. I think that Your Honor has. The entirety? I mean, that nothing would be owed at all? Potentially, yes, Your Honor. Where did they concede that? There was, well, there is evidence of that from my client in the form. You said they conceded it. Where did they concede it? Well, I think they conceded that there would be, there was a dispute as to the amount that was owed. Right. You said they conceded that the entirety. I misspoke on that point, Your Honor. I think my client submitted evidence that the entirety of the claims were in dispute. And they did so in a number of ways. I can point the Court to the record which contains a declaration of a Mark Killiam, who did an analysis of the invoices for just one station for one month, the month of November, 1999. And in that analysis, he showed that there were overcharges to Focus Media, sometimes as great as 300 percent. Now, if you just take that one month and extrapolate that over a year's time, you can see that easily the petitioning creditors could have owed Focus money at the end of the day. In addition, Your Honor, there were declarations that were submitted that showed that my client had raised claims in the preexisting litigation before this matter was ever brought to the bankruptcy court that had to do with breaches of the contracts between the broadcasters and Focus Media, substantial breaches relating to interference with contract claims, relating to the disclosure of trade secrets and other violations, which, if proven, could have completely vitiated the claims of the petitioning creditors. And the important thing about this particular piece of evidence is that it was completely unrebutted by the petitioning creditors. Your Honor, this is a case where the requirement that the claims not be in bona fide dispute, that is something that is part of the petitioning creditors' burden of proof. And they simply were not held to that burden by Judge March in this case. If you look at what this Court mandated in the Vortex decision, you will see that the bankruptcy court is instructed that in deciding whether a bona fide dispute exists for purposes of testing the involuntary petition, it is not to decide the outcome of the dispute. It is merely to look at the facts and the evidence and determine whether such a dispute exists, because the mere existence of that dispute disqualifies the involuntary bankruptcy petition and means that the case must be dismissed. As this Court put it in Vortex, the Court's role should be limited to the inquiry whether there are facts giving rise to a legitimate disagreement over whether or how much money is owed. The other teaching of Vortex, which Judge March likewise did not follow, is that the burden of showing the absence of a bona fide dispute is on the petitioning creditors. And I cannot stress this enough, because here the petitioning creditors did not meet that burden of proof before Judge March improperly shifted the burden to focus. In no way was the evidence that the petitioning creditors adduced in connection with their motion for summary judgment sufficient to establish a prima facie case that the claims on which the petition was predicated were not in bona fide dispute. But, secondly, and perhaps more importantly, is that after she improperly moved the burden to my client to show the existence of a dispute, Judge March ignored, focuses evidence of the existence of such a dispute. That evidence, I would submit to the Court, was specific, it was compelling, and, most importantly, it was unrebutted. It was far more probative than the evidence that was held to establish a bona fide dispute in the Vortex case. And I want to address that case for just a moment, because I think it is very instructive here. In that case, the debtor had made prepetition admissions that it owed the very debts on which the involuntary petition was predicated. Yet this Court affirmed the VAF's dismissal of the involuntary petition based on the absence of a bona fide dispute. And it did so in reliance upon two pieces of evidence. One, preexisting litigation between the petitioning creditor and the alleged debtor, which we had here, in which the alleged debtor had asserted a cross-claim and affirmative defenses, which we had here. And secondly, the debtor's allegation, allegation, that the petitioning creditor at issue had breached a separate agreement and that the breach of that agreement might give rise to a defense. In the final analysis, the only piece of documentary evidence that supported the finding of a bona fide dispute in the Vortex case was a solitary, self-serving letter that the debtor had written shortly before the litigation was filed. But this Court held that that was enough. I would invite this Court to contrast that evidence with the evidence that Focus presented on the issue of bona fide dispute. And I want to go through that briefly. The first thing that Focus did was it rebutted the petitioning creditor's main piece of evidence, the centerpiece of their motion for summary judgment, was this aged payables report, and Focus rebutted that with no less than five declarations that showed that it was not what the petitioning creditors purported it to be. Rather than a list of amounts owed by Focus, it was rather a listing of invoices offset of the amounts owed. Focus presented the evidence of the serious overcharges for the month of November 1999, as I mentioned. And in addition to the Killiam declaration. But in addition, Your Honor, we presented the declaration of Eric Selden, which showed specific discrepancies for three of the stations that filed joinders in the petition. And further, there was a declaration of Judy Thomas, who presented evidence that a mere partial post-analysis for Sears Holiday Advertising for 1999 showed significant discrepancies between what was ordered by Focus and what was actually delivered. In addition to that, Focus demonstrated to the Court why the discovery violations and stonewalling tactics of the petitioning creditors, combined with the lower court's orders, combined to prevent it from completing a post-analysis and reconciliation, something which was entirely within the realm of the petitioning creditors to do. They had access to all of that information. They had those documents. They admitted in this proceeding that post-analysis and reconciliation were industry-wide, accepted practices that would reduce the amount owed, and yet they never conducted that type of analysis. They simply put their evidence on the table and said, we don't know what is owed, but it looks like a lot to us. And Judge March accepted that. Well, did you ñ was there any evidence netting out by Focus Media as to what it ultimately said was in dispute? These declarations pick items and say they're overcharges, but it's not clear that they ever established that when you net it all out that there's any problem meeting the $10,000 threshold amount. $11,000. $11,000. I'm rounding down. Rounding up. Yes, Your Honor. Might as well. Everyone else did. Your Honor, no. Was that analysis done? No. As I've said before, it was not completed. And the reason was Focus was deprived of the information with which it might have done that kind of analysis at the first instance when Judge March appointed an interim trustee to take over the business and take possession of all of the documents and records, sell the computers with which Focus normally would have done such an analysis. All of the employees left the business at that point.  But certainly there were people at the petitioning creditor's places of business who could have done that had they chosen to do so. And again, this is the petitioning creditor's burden of proof. I come back to the statutory requirements. They had to show, first of all, that there were three qualified petitioning creditors, each of which was the holder of a claim which was not in bona fide dispute and over the statutory threshold amount. They failed to do so. I think in light of that, Focus's evidence of the existence of a bona fide dispute was overwhelming. And as I said before, most importantly, it was unrebutted. The net result of all of this, I would submit, since the Court's inquiry was limited Could I just ask a question? You said that the creditors could have done this analysis. How would they do the analysis? Go find on their run sheets when the ads were run and if they were out of time, make the adjustment themselves? Yes. Yes, Your Honor. That's one thing that they should look at is whether They had all that information because it was actually Focus Media. That was their basis for making the claim for adjustment. But would the stations know? How would they know when they were out of time? Was that something that they could readily run off of whatever data they had? Yes. Yes, Your Honor. There's a document called a broadcast log. And in fact, those were documents that my client asked to be produced in this case that never were, or at least not to the extent that we were able to conduct a complete post analysis. But that's just one kind of discrepancy that the stations would look at. A more significant one, and one about which there was quite a bit of testimony below, has to do with this most favored nations agreement or the agreement by the petitioning creditors to give Focus Media the best rate available to anyone. And that's where the declaration of Mark Killiam comes in. That is where Focus did not have enough information to perform an analysis except for the one-month period. But if you accept Mr. Killiam's declaration, and it's very clear on this point, and it has a chart attached which demonstrates the kinds of overcharges and the magnitude of the overcharges, if you extrapolate that over even a 12-month period, you find that significant amounts are owed coming the other way. So I think that, to answer the Court's initial question, there is more than enough evidence that the entirety of the claim was in dispute. I think that one has to distinguish this case from the cases that have been cited by the petitioning creditors, where it is possible to take the total claim and to break it, if that's even appropriate to do, but to break it into an undisputed portion and a disputed portion, so that there's some dollar amount that is virtually conceded or clearly documented is owed, and there's some dollar amount that's in dispute. This is not that case. This is a case where the magnitude of the disputes raised by my client created raised such a qualitative dispute that this is not a case that should have been in the Bankruptcy Court. Now, the petitioning creditors are not without a remedy if they cannot bring their left with their State court and perhaps Federal court claims where this litigation originated. So all we're saying is that involuntary bankruptcy is not the mechanism. Claims that are in bona fide dispute, if there is a legitimate dispute, which there was here, those claims should not be in the Bankruptcy Court. The other reason that we make of Mr. Field's statement in that State litigation and the Sears litigation is saying that, or acknowledging that Focus Media owes the money. He said there may be some cross, he said there may be some cross complaints, but I think that's a relatively minor part of it. We owe the money. I think the best that can be said of that evidence, Your Honor, is that it was a monolith, not referencing the petitioning creditors or any of them, referring to unsubstantiated and theoretical amounts of money in a different context between different parties with different issues. Again, I don't think that is the kind of evidence that was sufficient to meet the petitioning creditors' burden of proof on their motion for summary judgment. And in response to that, I think that the evidence that Focus seduced was more than sufficient. Again, I go back to the type of evidence that was held to establish a bona fide dispute in the Vortex case, evidence that was far less compelling than what we have here. The additional point I'd like to raise just briefly is the issue of the claims transfer in violation of Bankruptcy Rule 1003, which was an additional reason why the bankruptcy petition, the involuntary petition, should have been dismissed. Did you raise that issue in the lower court? Absolutely, Your Honor. It was raised. I should be more specific. In the district court? Yes, Your Honor. It was raised in the briefing to the district court. However, it was clearly part of the case in the bankruptcy court. And I think the record is fully developed on that. But it was raised in the opening brief to the district court, although it was not made a specific point of error in that court. But if the court looks at the record of the bankruptcy court proceedings, you will see that it was raised by counsel for Focus Media. It was argued. The witness was questioned about it. And the bankruptcy court made a specific finding of fact in her finding of facts and conclusions of law on that point. So, again, I think that was clearly, it was raised, it was not waived, as the petitioning creditors have contended. And even if it were, even if it had been waived, which is not the case, the record is fully developed. There are no factual issues to be resolved here. This Court can decide that issue as a matter of law based upon the record before it. You've got a little over a minute left. Do you want to reserve it? Yes, I do, Your Honor. Thank you. Good morning, Your Honor. Bruce Wessel for the appellees and the petitioning creditors, ABC, NBC, Paxson, WLS-TV, KTRK-TV, KGO-TV, KGO-Radio, and ABC Holding Company. I think it's helpful to lay out the timeline here so that the arguments can be dealt with in the proper order. The involuntary petition was filed in October of 2000, quite a long time ago. And Judge March ruled on summary judgment that seven of the eight petitioning creditors had claims that were valid and they were proper petitioning creditors. And that took place in August of 2001. So the question on appeal and appellants spent most of their time talking about this would be reviewing the record that was before the Court on summary judgment. Did Judge March do the right thing? And did Judge Stotler do the right thing in affirming that decision? And so I think the Court here is limited to whatever arguments were made on the summary judgment, not arguments that someone may have thought of three years later that were never presented to Judge March. It's not that kind of a process. You look to where things were in August of 2001. I'd like to stop there on the issue of post analysis and note that the invoices we're talking about were sent, the last one was sent 12-31-1999. And that's why they were listed on the payables report as 90 days old or older as of 3-31-2000. So from the end of 1999 until the filing of petition in October of 2000, they had nine months to do the post analysis and they didn't do it. And there are statements in the record when they were proceeding in the State Court where Mr. Rubin says we didn't do the post analysis. And then there was another period of time in the bankruptcy court until we got to October of 2001. So there were 20 months between the end of 1999 and the summary judgment hearing for Focus Media to do the post analysis. And in their briefs before this Court and even today, they say they didn't do it. They are not able to point to evidence where they did post analysis to show that the debts weren't owed. And I think that's the end of the story. I had a law school professor that said he thought my generation would die with its options open. I think we'll all die with Focus not having completed the post analysis. They had plenty of time to do the post analysis. They had plenty of discovery in the bankruptcy court. And they had nothing to show to dispute the debts of the petitioning creditors. With respect to the arguments they make on post analysis, I would point out that there's nothing in the record that shows any post analysis of any of the petitioning creditors. They can't point to anything in the record where they can show that Paxson Communications had any post analysis in 1999, anything to show post analysis for any of the petitioning creditors. So when we say this is made up out of whole cloth, we mean it. We're not saying that there isn't post analysis in the industry, and we're not saying that it doesn't sometimes happen. But what we're saying is that there's no evidence in the record to show that this was a common practice with respect to these petitioning creditors or any of the thousand television stations. If there was, they would have been able to say, look, we made an adjustment of 10 percent in December of 1999. We made an adjustment of 5 percent in November of 1999. We made an adjustment of 3 percent in October of 1999. And we can show we would have made those adjustments. That's just not in the record. One other point with respect to the petitioning creditors is ABC. And we had a trial for ABC, two-day trial in bankruptcy court. And all of these arguments were gone through. And there were witnesses from ABC, and there were witnesses from Focus, and they had every opportunity to dispute the ABC bills, and they couldn't. And there were findings after the bankruptcy court. And they're not, those findings are not really challenged. They weren't challenged before Judge Stotler, and they're not challenged here. Your opponent said that the post analysis was derailed by the appointment of a trustee. How do you respond to that? Well, I'd make one point, Your Honor, with respect to when that happened. That was October of 2000. And there was an appointment of an interim trustee. And they never came to this court and said that was a mistake. The appointment of the interim trustee makes it impossible for us to go forward. There's been a great injustice done. You should tell Judge March that she should not have appointed the interim trustee. So they had their avenues of appeal to try and get that undone and to take back control of the company. And they didn't take them. And so in their briefs here, they say, my gosh, what an injustice was done when she appointed an interim trustee in October of 2000. Well, it's a little late to start talking about that. Secondly, Judge March did not accept those arguments when she did not agree with their assessment, their excuse, if you will, for why they couldn't do their job as lawyers. And the excuse always was, well, the petitioning creditors aren't cooperating, the trustee isn't cooperating. And it just wasn't accurate. There were many hearings in the court below where the trustee came before the court and he gave access to all parties for various records. And I think it's in the record here, and it's a discussion on the whole discovery sanctions issue, that FOCUS delivered over 900 boxes of documents to our offices in response to Judge March's request that they do so. So they went to the trustee's location. They took the records out of the trustee's facility and they brought them to our office as part of the production. So they had full access to all the documents. It's not a fair charge, if you will, to say it's all the trustee's fault. And therefore, now in 2004, the entry of the order for relief should somehow be disturbed in October 2000, from October of 2001. I just came up in the district court. They rely on the Selton Declaration. If you read the Selton Declaration, what he says is after all the work that he did, he is able to say that one ad ran three minutes late and another ad ran five minutes early. That's his evidence of a dispute over these debts. It's clearly not sufficient to justify any finding that there was a bona fide dispute. I would like to address two other issues. One is the counsel argued that the creditors have the burden, however, to establish in the face of the allegation or the statement that they are in dispute to show that there's enough to meet in this context a relatively low threshold. What's your response to that? What evidence did the creditors come forward to show that there was well in excess of any reasonable amount of dispute? I think that we have evidence unique to involuntary bankruptcy law, that there were admissions over and over again by the debtor that the amounts were owed to the media. There wasn't an argument that the amounts were not owed to the media. They said that over and over again in state court. They said it in the bankruptcy court, and they said it under oath. They said we owe the media for the amount of money that we collected from Sears for the ads. So I think that those admissions and the analysis. There was also the age payables record, which showed the invoices that were sent for that time. And there are also the petitions themselves in this case, the first one of which is pages one, two, and three of the appellate record, which are sworn statements from the petitioning creditors as to the amounts owed. So I think in the context of a trial, we obviously had a witness who came forward and explained in detail and went through all the invoices and the judgment findings from the trial testimony. But at summary judgment, all we had to do was shift the burden to them on the CELATEC standard to say, what evidence do you have that these amounts aren't owed? So given that you've admitted repeatedly that you owe the money, and given that your age payables records show that you owe the money, and they weren't able to come up with anything to dispute it, and essentially they concede that they weren't able to come up with anything, and they blame the trustee for it, and they blame the petitioning creditors for it, and they blame Judge March for it. But if that's all you had to do to oppose a summary judgment motion was find some excuse why you didn't have the evidence, then everyone would have that argument. There never would be summary judgment. And here you have the unique circumstance where after the summary judgment, there was a trial for one of the petitioning creditors, and there were findings of amounts owed. I would like to address just briefly the mootness point, because I think it's important here, again, to go through the timeline. It's now 2004, and there have been many, many proceedings in the bankruptcy court since the entry for the order for relief in October of 2001. There have been settlements. There have been lawsuits filed. There have been claims abandoned. And the activity in the bankruptcy court was significant, because once the order for relief was entered in October of 2001, the clock started ticking on two different two-year statutes of limitations, one under 11 U.S.C. 108A2 and one under 11 U.S.C. 546A12. And what they say is that the trustee who was appointed with the entry for the order for relief has two years to bring claims against a variety of people. And he did that, and he got to October of 2003, and he filed a notice, and he said, I'm going to abandon the remaining claims. So it's hard to fathom how one could undo all the things that have happened in the bankruptcy court since the case was filed in 2000. And where this would leave people who have settled with the trustee, people who have judgments against them because the trustee has pursued them, people ---- Is this the kind of order that could be stayed pending appeal? Absolutely. And the case law on this issue says that if you don't ask for a stay pending appeal, that's when these kinds of mootness arguments kick in. And I don't quite fathom how this would work. Let's say you accepted, for example, Focus's argument that Judge March should have recused herself and that this case should have been tried by a different judge, and we went back to the bankruptcy court and we were in front of Judge Zerzolo. Where would we be? We would then have a new judge. We'd start all over again. I guess the trustee would become the interim trustee again. I don't know what would happen to all the actions that the trustee has filed. I don't know what would happen to all the settlements the trustee has entered into. It would be a mess. And what Eastern says and other bankruptcy cases say is that sometimes you can look at a situation and say that just too much time has passed. We can't undo all that's been done in the bankruptcy court, and we will find the appeal moot. You could do that here without any concern that they didn't have their day in court. They did have their appeal before Judge Stotler. Without any concern that they move things quickly, they ask for delays in this appeal. They never ask for a stay. What would be the prejudice to the creditors? The prejudice to the creditors to go back would be immense, because the creditors would then have to pay for going through all this again. And we'd go through it again, and let's suppose Judge Erzolo said. Well, that would be true if it had come up promptly and you'd lost. If they'd come up promptly, sought expedited relief or whatever, you'd still have to go. Or even if it stayed, if you had to go back before another judge, you'd still have to pay to go all over again, right? But we wouldn't be three years later with memories faded and documents gone. And given the pace of this, we would then be back up here three years from now. But we're just supposed to speculate about that? I mean, you said that the voluminous records have been exchanged and cases have proceeded in the state court. I don't think you have to speculate that as of October 2000, the filing of the involuntary petition, the cases against Focus were stayed. So that was three and a half years ago, the cases that were sitting there in state court. And they're still stayed in state court because of the bankruptcy. You know that the interim trustee became a permanent trustee in October of 2001. And you know from the docket that the — Do you have any issues as to whether or not it's an adjustment due? What's the big deal about memories fading and whatever? I guess I have — you're saying that invoking the normal consequences of something coming at a later date and time. But given the facts and the nature of this case, what is the memory fading problem? Well, I — let me — I've tried cases where it's been eight, ten years. That's certainly the case. And we would certainly find the people to show that the debts were due. I think the more important point is what happens to all of the things that have happened in the bankruptcy court. I presume they would argue if you went back to the bankruptcy court for a trial on the merits on the seven petitioning creditors, they would argue some of those settlements are valid. There was no — they didn't seek to stay the entry of the settlement. So money that came into the estate from insurance companies or from third parties who had sued, those — that stays there. You have the pending case against Mr. Rubin that still remains in the bankruptcy court and may be tried in the bankruptcy court. What happens to that if you go back? You have to kind of stop the trustee in his tracks and say, stop prosecuting claims against people. They might be dissipating assets today. Those claims may be gone. So I think there's a practical aspect of this that says, how would you undo what's happened over the last two years? And I think that argues that if you want to appeal an involuntary petition, you better ask for a stay and you better seek expedition. And Rule 1013A says that these are — these cases are supposed to be decided at the earliest practicable time. And that's what guides all the courts, not just the trial court, but should guide the parties in the appellate court. So don't do things to slow things down. Do things to speed them up so you can decide whether a company should be in involuntary proceeding or not. So I think that even if you look at the documents that they have asked you to take judicial notice of, the tentative settlement between the trustee and Mr. Rubin, and you look at that, and what that contemplates is that Mr. Rubin will return millions of dollars to FOCUS, to the estate, and that the estate will assign certain claims to him that he can then pursue. What happens to that tentative settlement if it ever becomes a real settlement, if you go back? And, in fact, when the sole shareholder of the company goes in the bankruptcy court and says, I'd like to settle the claims of the trustee against me, and I'd like the court to be part of the settlement process, I think that at that point they're essentially consenting to the entry of the order for relief, and that it's inequitable for them to still be arguing that it should somehow be set aside. So I think on the mootness point, it's my job to raise all of these questions. It's their job to say, how can you undo things now that so much time has passed, including passage of various statutes of limitations? I'd like to underscore a point that was made in the bankruptcy court before Judge Stotler, that Mr. Rubin's admission that he paid the bills within 90 days, and his admission that there were debts that were over 90 days old, means that they weren't paying their debts as they became due, and they owed the money to the petitioning creditors. There is nothing in the declarations of Mr. Rubin that he submitted in the State court about the 90-day issue that says anything about not having to make the payment within 90 days. What he says is, we make the payment, and then they come up with the post-analysis argument, we might need to adjust it, adjust it later. So I think the 90-day issue is one that is an open and shut case where they basically admitted that they're not paying the debts. On the issue of the discovery sanction, which I think is irrelevant, because the judge found in her summary judgment ruling that they had admitted that the debts were owed, I think I'd ask the court to look at Mr. Stolman's declaration, Exhibit E, and in that declaration of which the court took judicial notice, you will see that the documents that Judge March said were missing, the financial records of focus from July, August, and September of 2000, in fact existed, and Mr. Stolman had them. And that is evidence that's now in the record that they had financial records and they simply didn't turn them over. They were giving them to their lawyers. They didn't turn them over. Another point, we've made this point consistently throughout this case, they always had the ability under 11 U.S.C. 706 to convert this into a Chapter 11, to say we want to pay our creditors, we need time to reorganize. This is not this draconian issue that they keep saying. It's their choice to have decided to contest this, and they didn't have to do so. Unless there are any other questions, that's all I have. All right. Thank you, Mr. Wessel. Thank you. Rebuttal. Thank you, Your Honor. On the issue of mootness, I think that's adequately covered by our brief. I would simply say that the petitioning creditors have the burden of proof on this issue, one that they have not sustained here. They certainly have not shown a substantial change in circumstances since the order for relief was entered. And we have shown, and the record reflects, that Focus Media asked for stays of the order for relief, both in the Bankruptcy Court and in the District Court, and those requests were denied. So I think that it clearly is not moot, that doctrine does not apply here. And certainly this Court is capable of fashioning an effective remedy in the form of sending this case back with an order of dismissal and allowing my client to pursue its remedies under Bankruptcy Code Section 304. You say order of dismissal. You mean dismissal of the petition, the involuntary petition? Yes, Your Honor. What happens to all the, you know, the interim settlements that the trustee made? Well, Your Honor. The compromises. The trustee made whatever settlements he made knowing that this case was on appeal. And not only knowing that. Well, also knowing that you didn't obtain a stay. I'm sorry, Your Honor? Also knowing that you did not obtain a stay. We were not successful in obtaining a stay. You didn't apply for one to this Court, did you? No, Your Honor. We did not. The point of the matter is that most, if not all, of the harm was done within the first 20 days after the case was filed when Judge March awarded them an interim trustee at the instance of petitioning creditors and then allowed the fire sale of my client's assets. And an appeal was taken from that. Appeals were taken from virtually all of the adverse orders of Judge March. No less than eight appeals in this matter, Your Honor. So case decidedly is not moot. I see that my time is up. May I have just one moment to wrap up? Go ahead. Thank you. On the issue of the post-analysis not having been done, there's a very significant point on this, and that is the petitioning creditors concede this concept of reconciliation in post-analysis. They know that was something they were supposed to do. They know it was supposed to have been done. And yet they brought their claim in involuntary bankruptcy against my client, knowing that there were disputes at least as to the amount. And I submit that under Vortex, that is quite enough for us to show. But we have more than that here. Thank you, Your Honors. All right. Thank you. I'd like to make one appellate observation. Many years ago, I argued a case before the Ninth Circuit, and Gus Solomon lectured me, and it's a lesson I never have forgotten, in part because he put it in a published opinion. I found the briefing by counsel for the debtor to be over the top. And it's a tax on the bankruptcy judge. That is not good strategy. It is not well received by the appellate bench. I got lectured on it, and I remembered it, so I pass it on. Actually, a lot more kindly than Gus Solomon told me about. So lesson, at least from this judge's perspective. I no doubt will not forget that, Your Honor. Thank you. All right. We thank counsel for your argument. This case is submitted.
judges: T.G. Nelson, Tashima, Fisher